IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IGOR BELYAKOV                                   :

                                                :

    v.                                          :  Civil Action No. DKC 2004-4008

                                                :

MICHAEL O. LEAVITT[1]                           :

                                                :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case is the motion of Defendant Michael O. Leavitt, Secretary of the United States Department of Health and Human Services, for summary judgment (Paper 78).  The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.  For the reasons that follow, the court will grant the motion.

**I.   Background**

   **A.   Factual Background**

The following facts are either undisputed or viewed in the light most favorable to Plaintiff Igor Belyakov.  Plaintiff, a United States citizen of Russian origin, was employed by Defendant, the United States Department of Health and Human Services ("HHS"), at the National Institute of Health ("NIH") as a staff scientist. In 2002, the National Institute of Dental and Craniofacial Research

---

[1] Michael O. Leavitt is substituted as Defendant in place of the former Secretary of the United States Department of Health and Human Services, Tommy G. Thompson.  *See* Fed.R.Civ.P. 25(d)(1).

("NIDCR"), an institute within NIH, advertised a tenure-track position for a Mucosal Immunologist. On October 4, 2002, Plaintiff applied for the job.

An independent search committee was formed to fill the position. Dr. Sharon Wahl, Oral Infection and Immunity Branch Chief, and Dr. Henning Birkedal-Hansen, NIDCR Scientific Director, selected the search committee (Paper 78, Ex. 37, Wahl Dep., at 22-23) and it was approved by Dr. Michael Gottesman, NIH Deputy Director of Intramural Research (*id*. Ex. 38, Tabak Dep., at 29). The search committee was chaired by Dr. Warren Strober, and consisted of Dr. Nicholas Ryba, Dr. Rachel Caspi, Dr. Nancy Vazquez-Maldonado, Dr. Howard Weiner, Dr. Philip Smith, and Ms. Sharrell Butler. (*Id*. Ex. 7). Dr. Lawrence Tabak, NIDCR Director, did not participate in the formation of the search committee. (*Id*. Ex. 38, Tabak Dep., at 30).

The committee members were given the applications of twelve candidates who applied for and met the minimum requirements for the position. They were asked to review the applications and rank the candidates. (*Id*. Ex. 8). The committee ultimately decided that Dr. Wanjun Chen and Plaintiff were the top two candidates. (*Id*. Ex. 13). As part of the hiring process, Dr. Chen and Plaintiff were each invited to give a seminar presentation to the search committee. The purpose of the seminar presentation was to allow each candidate to summarize his work, project into future areas of

interest, and provide rationales for the scientific directions he wished to take in the future, as well as to allow the committee members to ask scientific questions of each candidate and to evaluate his ability to answer those questions. (*Id*. Ex. 38, Tabak Dep., at 34).

Plaintiff presented his seminar on March 18, 2003. (*Id*. Ex. 18).  That same day, Plaintiff also met individually with Dr. Wahl and Dr. Tabak prior to his seminar.  (*Id*. Ex. 18).  Plaintiff states that during this meeting, Dr. Tabak asked him about his national origin, and, after Plaintiff stated he was of Russian origin, commented that "there are too many Russian scientists at the NIDCR already."  (Paper 79, Ex. 10, Belyakov Decl. ¶¶ 6-7). Dr. Tabak denies making that statement. (Paper 78, Ex. 38, Tabak Dep., at 93).[2]

Members of the search committee attended Plaintiff's seminar and interviewed him afterward.  (*Id*. Ex. 37, Wahl Dep., at 103-04). Based on their evaluations of Plaintiff's seminar and interviews, the members of the search committee decided that they did not need, and would not attend, a second seminar by Plaintiff.  (*Id*. Ex. 30; *id*. Ex. 37, Wahl Dep., at 104-05).  The committee members decided that Plaintiff was no longer a suitable candidate for the position. (*Id*. Ex. 30).

---

[2] Plaintiff proffers no evidence that anyone else overheard this alleged remark or otherwise was aware of Dr. Tabak's views.

On September 5, 2003, the search committee sent a memorandum to Dr. Wahl, formally recommending Dr. Chen for the position. (*Id.* Ex. 23). Dr. Wahl then corresponded with Dr. Birkedal-Hansen, scientific director of NIDCR, notifying him of the committee's recommendation and concurring in its decision. Dr. Wahl's recommendation was based on information provided by the search committee, information provided by members of her staff who participated in the seminars and interviews of the candidates, her own evaluations of the candidates, and the letters of recommendation. (*Id.* Ex. 37, Wahl Dep., at 40-41).

Dr. Birkedal-Hansen then notified Dr. Tabak, director of NIDCR, that the committee had selected Dr. Chen and also concurred in the recommendation. (*Id.* Ex. 38, Tabak Dep., at 78-80). Dr. Tabak approved the selection of Dr. Chen (*id.* at 24-25) and sent a form to Dr. Gottesman, NIH Deputy Director for Intramural Research, recommending Dr. Chen for the position (*id.* at 83-84). Dr. Tabak states that he approved Dr. Chen for the position based on the recommendation of the search committee, the recommendation of Dr. Birkedal-Hansen, and his personal impressions at the time of Dr. Chen's seminar and interview. (*Id.* at 80). Ultimately, Dr. Gottesman gave the final approval of the selection of Dr. Chen. (*Id.*).

On September 23, 2003, Dr. Wahl contacted Plaintiff to inform him that the search committee had recommended Dr. Chen for the

position; that the director, scientific director, and the branch chief concurred in the decision; and that paperwork had been submitted to appoint Dr. Chen. (*Id*. Ex. 25). On September 25, 2003, Plaintiff complained about the selection process to Dr. Elias Zerhouni, NIH Director, and Dr. Gottesman. (*Id*. Ex. 26). Dr. Gottesman contacted Plaintiff and told him that no tenure-track positions were approved without his permission, and that he would investigate Plaintiff's claims. (*Id*. Ex. 27). On January 27, 2004, Dr. Gottesman contacted Plaintiff to let him know that he would be receiving a memorandum explaining the decision not to hire him. (*Id*.). In the memorandum, Dr. Gottesman stated that he polled all the members of the search committee, and that they all concluded, based on Plaintiff's seminar and references, that he was not "the best qualified candidate for the position." (*Id*. Ex. 31).

### B. Procedural History

On December 23, 2004, Plaintiff filed a complaint against Defendant HHS. The complaint alleged that he was discriminated against on the basis of age and national origin and subjected to a hostile work environment. Plaintiff asserted that because of discrimination he was not promoted to the position of Mucosal Immunologist or to the position of Molecular Microbiologist/Immunologist, positions for which he was qualified and had applied.

Defendant filed a motion to dismiss or for summary judgment in lieu of an answer on May 27, 2005. (Paper 10). Plaintiff then filed an opposition, conceding that he could not state a claim based on his non-selection for the Molecular Microbiologist/Immunologist position or based on hostile work environment. (Paper 12). Plaintiff later filed a notice withdrawing his age discrimination claim. (Paper 22). Defendant filed a reply, withdrawing its original motion to dismiss or for summary judgment (Paper 16), and filed an amended motion shortly thereafter (Paper 18). On November 22, 2005, this court issued a Memorandum Opinion denying Defendant's motion with respect to Plaintiff's claim that he was not selected for the Mucosal Immunologist position because of national origin discrimination. (Paper 31). After discovery, Defendant filed a motion for summary judgment on this, the sole remaining claim. (Paper 78).

## II.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then

summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1987). The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he or she is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of South Carolina v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d

7

529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).  There must

be "sufficient evidence favoring the nonmoving party for a jury to

return a verdict for that party.  If the evidence is merely

colorable, or is not significantly probative, summary judgment may

be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

**III. Analysis**

There are two methods for proving intentional discrimination

in employment: (1) through direct or indirect evidence of

intentional discrimination, or (2) through circumstantial evidence

under the three-step, burden-shifting scheme set forth by the

Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802-05 (1973).

For the first method, an employee may utilize "ordinary

principles of proof using any direct or indirect evidence relevant

to and sufficiently probative of the issue." *Rhoads v. Fed.

Deposit Ins. Co.*, 257 F.3d 373, 391 (4th Cir. 2001) (internal

quotation omitted), *cert. denied*, 535 U.S. 933 (2002).  In order to

overcome a summary judgment motion based upon this method of proof,

the plaintiff "must produce direct evidence of a stated purpose to

discriminate and/or [indirect] evidence of sufficient probative

force to reflect a genuine issue of material fact." *Id.* (internal

quotation omitted) (alteration in original).  More specifically,

the plaintiff must provide "evidence of conduct or statements that

both reflect directly the alleged discriminatory attitude and that

bear directly on the contested employment decision." *Id.* at 391-92 (internal quotation omitted).

Under the *McDonnell Douglas* framework, the plaintiff first must establish a *prima facie* case of discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802. Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to present a legitimate, nondiscriminatory reason for the adverse employment action alleged. *See Reeves*, 530 U.S. at 142 (citing *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If the defendant succeeds in doing so, that will rebut the presumption of discrimination raised by the plaintiff's *prima facie* case. *See Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000) (citing *Burdine*, 450 U.S. at 255 n.10). The plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. In the end, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Burdine*, 450 U.S. at 253).

**A.   Direct Evidence**

Plaintiff has testified that Dr. Tabak told him there were "too many Russian scientists at the NIDCR already," during the

course of an interview for a tenure-track position.   Dr. Tabak denied making that statement.   In considering a summary judgment motion, however, the court "must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence." *Williams v. Staples, Inc.*, 372 F.3d 662, 667  (4th Cir. 2004).   Even assuming the truth of Plaintiff's factual allegation, Dr. Tabak's alleged statement is insufficient to survive summary judgment because Dr. Tabak was not the actual decisionmaker under the guidelines set forth by the Fourth Circuit in *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004)(emphasis added):

> [T]o survive summary judgment, an aggrieved employee who rests a discrimination claim under Title VII . . . upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one *principally responsible for the decision* or the *actual decisionmaker* for the employer.

A number of people were involved in the decision-making process that resulted in the non-selection of Plaintiff for the Mucosal Immunologist position.   Dr. Wahl and Dr. Birkedal-Hansen selected the members of the search committee.[3]   The seven search committee members narrowed down the pool of applicants and at least some of them attended Plaintiff's seminar presentation and

---

[3] Plaintiff does not allege any discriminatory animus on the part of Dr. Wahl, Dr. Birkedal-Hansen or any of the search committee members.

interview.   The search committee met and agreed to recommend Dr. Chen rather than Plaintiff for the position.   The committee's recommendation was sent to Dr. Wahl, who concurred in the recommendation; she sent it to Dr. Birkedal-Hansen, who concurred; he sent it to Dr. Tabak, who concurred; and he sent it to Dr. Gottesman, who gave the final approval.

Plaintiff argues that Dr. Tabak must have been the final decisionmaker because he "1) holds the highest position at NIDCR, 2) has authority over every other person in NIDCR, 3) approved members of the Mucosal Search Committee and Dr. Wahl as one of the Selecting Officials in this Search process, 4) interviewed Plaintiff and Dr. Chen, 5) attended Plaintiff's and Dr. Chen's seminars, and 6) approved the decision to hire Dr. Chen. . . ." (Paper 79, at 10).   Plaintiff offers no evidence that Dr. Tabak approved the members of the Mucosal Immunologist search committee or approved Dr. Wahl as a selecting official.   Dr. Tabak has testified that he "had nothing to do with the formation of the search committee."  (Paper 78, Ex. 38, Tabak Dep., at 30).

Dr. Tabak had *some* role in the decision to hire Dr. Chen rather than Plaintiff.   As the court noted in its previous Memorandum Opinion, "Dr. Tabak played an active role in confirming the recommendation of the search committee to hire Dr. Chen and that based on this confirmation the paperwork was submitted to hire Dr. Chen."  (Paper 31, at 9).   Dr. Tabak was not, however, either

the final decisionmaker nor "principally responsible" for the hiring decision. *See Hill*, 354 F.3d at 291 (declining to impute to the employer "the discriminatory motivations of subordinate employees having no decisionmaking authority . . . simply because they have influence or even substantial influence in effecting a challenged decision.").

Although Dr. Tabak may have been the highest ranking NIDCR official to approve Dr. Chen's selection, his recommendation was still subject to approval by Dr. Gottesman. Both Dr. Gottesman and Dr. Tabak agreed that Dr. Gottesman had the final approval. At his deposition, Dr. Tabak was asked: "In fact, you were the last word on [the selection of Dr. Chen], right? Was there anyone who approved your decision?" He replied, "Dr. Gottesman approves all appointments within the intramural program." (Paper 78, Ex. 38, Tabak Dep., at 24-25). Similarly, Dr. Gottesman wrote, in an e-mail to Plaintiff, "[n]o tenure-track appointments are made without my approval." (Paper 78, Ex. 27). The actual decisionmaker for the Mucosal Immunologist position was Dr. Gottesman.

Dr. Gottesman conducted an independent review of the selection process in response to Plaintiff's written complaint that the process was conducted unfairly.[4] Dr. Gottesman contacted several search committee members to investigate Plaintiff's complaint. He

---

[4]   Plaintiff did not raise allegations of national origin discrimination in his complaint to Dr. Gottesman.

determined that the search was conducted fairly and that Plaintiff was not chosen for the position because the search committee concluded that Plaintiff was not the best qualified candidate, based on his seminar and references. (Paper 78, Ex. 31). There is no evidence that Dr. Gottesman simply "rubber-stamped" the approval of Dr. Chen or that he was illegally influenced by Dr. Tabak. Even if Dr. Tabak's recommendation was tainted by discriminatory animus, those illegal motivations may not be imputed to the employer when the formal decisionmaker, Dr. Gottesman, conducted an independent review of the process. As aptly stated by United States District Court for the Western District of Virginia:

> [A]n employer may be liable for an adverse employment action even if the formal decisionmaker lacks any retaliatory animus, so long as the plaintiff presents sufficient evidence to establish that a subordinate with such animus was the one principally responsible for, or the actual decisionmaker behind, the action. A plaintiff will have failed to make this showing, however, if there is evidence that the formal decisionmaker conducted an independent investigation into the circumstances surrounding the employee's termination -- and did not just blindly adopt the subordinate's recommendation.

*Collier v. Sch. Bd. of City of Charlottesville*, 2006 WL 435478, *5 (W.D.Va. Feb. 21, 2006) (footnote and internal citations and quotations omitted), *aff'd*, 2007 WL 217271 (4th Cir. Jan 29, 2007). Dr. Gottesman investigated the selection process and determined that the non-selection of Plaintiff was appropriate. He did not blindly accept the recommendation of Dr. Tabak or of anyone else.

13

Nor is there any evidence that Dr. Tabak influenced the deliberations of the search committee or the others who recommended Dr. Chen for the position.  Defendant has offered evidence that Plaintiff would not have been hired even if no other candidate was available, regardless of Dr. Tabak's endorsement.  In an e-mail response to Dr. Gottesman's investigation into the search process, Arlyn Garcia-Perez wrote, "the [search committee] members have been polled and they are in unanimous agreement that [Plaintiff] would not have been hired, even if Dr. Chen had not been there to compete for the position - they all said they would have rather started all over because it was evident that [Plaintiff] 'was not suitable for an independent Investigator position.'"[5]  (Paper 78, Ex. 30, E-Mail Jan. 21, 2004).

Plaintiff argues, apparently as circumstantial evidence of discrimination, that a number of participants in the search process exhibited favoritism toward Dr. Chen because of their close working relationships with him.  (Paper 79, at 12-13).  Plaintiff does not allege that the favoritism resulted from discriminatory animus toward Russians.  Title VII does not authorize courts "to declare unlawful every arbitrary and unfair employment decision.  To hold that favoritism toward friends and relatives is *per se* violative of

---

[5]  From her e-mail address, it appears that Garcia-Perez works in the Office of the Director of NIH, however her precise employment position is unclear.

Title VII would be, in effect, to rewrite federal law." *Holder v. City of Raleigh*, 867 F.2d 823, 825-26 (4th Cir. 1989).

## B. Pretext Framework

Alternatively, Plaintiff argues that he can establish national origin discrimination through the familiar *McDonnell Douglas* burden-shifting framework.

In order to establish a *prima facie* case for discriminatory failure to promote, a plaintiff must show that (1) he is a member of a protected group, (2) there was a specific position for which he applied, (3) he was qualified for that position, and (4) the defendant rejected his application under circumstances that give rise to an inference of discrimination. *Williams v. Giant Food, Inc.*, 370 F.3d 423, 430 (4th Cir. 2004). Defendant concedes that Plaintiff satisfies the first three elements of the *prima facie* case, but it disputes the fourth element. In a variety of circumstances, the selection of a person outside a plaintiff's protected class can serve to provide the necessary fourth element. See *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005), *Amirmokri v. Baltimore Gas and Elec. Co.*, 60 F.3d 1126, 1130 (4th Cir. 1995). Thus, the selection of Dr. Chen, a person outside Plaintiff's protected class satisfies that element.

The burden now shifts to Defendant to articulate a legitimate, non-discriminatory reason for not selecting Plaintiff for the Mucosal Immunologist position. Defendant states that it did not

choose Plaintiff because he was not the most qualified candidate. (Paper 78, at 16).   Defendant reached this decision after evaluating Dr. Chen's and Plaintiff's seminars and references. (Paper 78, Ex. 31).  Several internal documents support Defendant's reason.  In October 2003, Dr. Birkedal-Hansen wrote a memorandum to Dr. Gottesman, formally recommending Dr. Chen for the position and explaining the reasons the committee chose Dr. Chen over Plaintiff:

> While the Selection Committee felt that the other applicant [Plaintiff] was "qualified" for the position, they considered Dr. Chen to be the top candidate, based on his experience in all areas of interest, publication record, and evidence of ability to conduct high-quality independent research.   In addition, the Branch in which the position is located felt that it was essential for the applicant to have experience in oral tolerance, which only Dr. Chen had.   Moreover, Dr. Chen was considered to be a "very vigorous and energetic scientist who has numerous and well thought out research ideas", essential for a tenure track investigator and furthermore, Dr. Chen's areas of interest "mesh well with the on-going research" of the Branch.

(Paper 78, Ex. 28).  Dr. Ryba, a search committee member, wrote in January 2004 that after attending Plaintiff's seminar and interview he became "convinced" that Plaintiff was no longer suitable for the position.  (*Id*. Ex. 30, E-Mail Jan. 9, 2004).  Dr. Ryba thought Plaintiff's seminar had been "a disaster," that it did not present sufficiently his individual contribution to the research, that Plaintiff failed to answer straightforward questions, and, in response to Dr. Ryba's questions about the trajectory of his

career, Plaintiff responded that it was "none of [Dr. Ryba's]
business to ask these questions." (*Id.*).  Dr. Ryba's impression
was that Plaintiff was "hardworking, productive and ambitious, but
came across as somewhat dogmatic, even a bit arrogant, and without
clear depth of thought.  In his answers to questions during and
after his formal presentation, he did not appear sufficiently
critical of his own data and aware of their limitations." (*Id.* E-
Mail Jan. 9, 2004, Attachment).  In contrast, Dr. Chen had
"considered and straightforward answers" to similar questions.
(*Id.* E-Mail Jan. 9, 2004).  Dr. Chen "made a quite positive
impression.  During and after his presentation he fielded questions
well and thoughtfully, and seemed aware of the limitations of his
data. . . He is already well integrated into the branch, has
ongoing collaborations and is considered a team player." (*Id.* E-
Mail Jan. 9, 2004, Attachment).  In response to Dr. Gottesman's
investigation, Dr. Strober, chair of the search committee wrote:

> The unfavorable impression created by
> [Plaintiff] was not related to the the [sic]
> perception that his work was not related to
> mucosal immunology, but rather to the fact
> that he seemed to lack direction and displayed
> a lack of understanding of some aspects of his
> own work.  In addition, certain concerns about
> his general demeanor raised questions relating
> to his ability to fit in with Sharon Wahl's
> group.

(*Id.* Ex. 27, E-Mail Jan. 14, 2004).  Defendant has offered evidence
that it chose Dr. Chen rather than Plaintiff because he was a more
attractive candidate for a variety of legitimate, non-

discriminatory reasons, including giving a better overall seminar, answering questions more thoughtfully, thinking more critically about his own data, and appearing more personable.

Plaintiff now must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. Plaintiff's sole argument in this regard is that the reasons offered by Defendant must be pretextual because Dr. Chen was not qualified for the position for which he was selected. As proof of this claim, Plaintiff offers expert testimony from Dr. Philip Carter, a Professor of Microbiology and Immunology. Dr. Carter submitted an affidavit stating that Plaintiff was substantially more qualified than Dr. Chen and that he "can only conclude that the decision was made on other, unstated bases." (Paper 79, Ex. 1, Carter Aff. 2005, at 8).[6] To prepare his affidavit, Dr. Carter reviewed the curriculum vitae for both Plaintiff and Dr. Chen, reviewed Plaintiff's application letter and reviewed the description of the job opening. (*Id*. at 2). Dr. Carter was not present at the interviews or seminars presented by

---

[6] The quoted affidavit was dated August 23, 2005. Dr. Carter submitted a second affidavit on August 7, 2006, stating that he stood by his previous affidavit, his opinion remained unchanged and that he failed "to understand how seminar presentations on mucosal immunology by each candidate would have changed that equation in light of the scientific knowledge and experience the position required that Dr. Chen did not possess." (Paper 79, Ex. 2, Carter Aff. 2006).

the two finalists, and admitted that Dr. Strober was more "distinguished" than he, spends a greater portion of his time in research (Paper 78, Ex. 40, Carter Dep., at 22-23, 28), that others on the search committee would have a "better understanding" than he of the work of the two candidates (*Id*. at 27), and that he was unfamiliar with the requirements within NIH for the composition of a selection panel (*Id*. at 33).

Defendant challenges Dr. Carter's expert qualification under Fed.R.Evid. 702, arguing that he lacked a proper basis for expressing an opinion as to the relative qualifications of the two candidates.[7] It also contends that his testimony amounts merely to a difference of opinion, which is insufficient to generate an issue of pretext, *citing Scott v. University of Mississippi*, 148 F.3d 493, 509 (5th Cir. 1998), *overruled on other grounds*, *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000).

---

[7]  Fed.R.Evid. 702 provides:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to
> understand the evidence or to determine a fact
> in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or
> education, may testify thereto in the form of
> an opinion or otherwise, if (1) the testimony
> is based upon sufficient facts or data, (2)
> the testimony is the product of reliable
> principles and methods, and (3) the witness
> has applied the principles and methods
> reliably to the facts of the case.

It is axiomatic that:

> Expert testimony is admissible under Rule 702
> . . . if it concerns (1) scientific,
> technical, or other specialized knowledge that
> (2) will aid the jury or other trier of fact
> to understand or resolve a fact at issue. *See*
> *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.
> 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469
> (1993). The first prong of this inquiry
> necessitates an examination of whether the
> reasoning or methodology underlying the
> expert's proffered opinion is reliable-that
> is, whether it is supported by adequate
> validation to render it trustworthy. *See id.*
> at 590 & n. 9, 113 S.Ct. 2786. The second
> prong of the inquiry requires an analysis of
> whether the opinion is relevant to the facts
> at issue. *See id.* at 591-92, 113 S.Ct. 2786.
> Thus, an expert's testimony is admissible
> under Rule 702 if it "rests on a reliable
> foundation and is relevant." *Kumho Tire Co. v.*
> *Carmichael*, 526 U.S. 137, 119 S.Ct. 1167,
> 1171, 143 L.Ed.2d 238 (1999) (internal
> quotation marks omitted).

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260-61 (4th Cir.
1999). Plaintiff has not shown that Dr. Carter's own background
and experience qualify him more than the search committee members
to assess the relative qualifications of the two candidates. More
significantly, moreover, he lacked the factual basis for any
relevant opinion because he was not present at the interviews and
presentations that played so large a role in the selection
decision.

Ultimately, the relative qualifications of the two candidates
did not affect the decision not to select Plaintiff. Even if Dr.
Chen had not been selected, the uncontroverted evidence is that the
position would have remained unfilled and the selection process

begun anew because the selection committee, after observing Plaintiff's seminar, concluded that Plaintiff was not qualified for the position after all.  Whether Dr. Chen was more or less qualified for the position than Plaintiff is irrelevant because the committee members unanimously agreed that Plaintiff "would not have been hired, even if Dr. Chen had not been there to compete for the position." (Paper 78, Ex. 30, Email Jan. 21, 2004).  The committee members stated that they would prefer to re-start the search process rather than hire Plaintiff.  (*Id*.). Defendant reviewed Plaintiff's application materials, observed his seminar presentation, and interviewed him personally.  It then determined that Plaintiff was not suitable for the position.  "[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by [employers] charged with employment discrimination." *DeJarnette v. Corning Inc*., 133 F.3d 293, 299 (4th Cir. 1998).  Plaintiff has failed to rebut Defendant's legitimate, non-discriminatory reasons with evidence of pretext and Defendant is therefore entitled to summary judgment.

**IV.  Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment will be granted.  A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge